Richard L. SATTERFIELD, Appellant,

v.

The EDENTON–CHOWAN BOARD OF EDUCATION, a public body corporate of Chowan County, North Carolina, et al., Appellees.

No. 75–1191.

United States Court of Appeals, Fourth Circuit.

Argued June 13, 1975.

Decided Dec. 5, 1975.

Louis L. Lesesne, Jr., Charlotte, N. C. (Adam Stein, Chambers, Stein & Ferguson, Charlotte, N. C., on brief), for appellant.

Norman W. Shearin, Jr., Elizabeth City, N. C., Wiley J. P. Earnhardt, Jr., Edenton, N. C. (L. P. Hornthal, Jr., LeRoy, Wells, Shaw, Hornthal, Riley & Sherin, Elizabeth City, N. C., Earnhardt & Busby, Edenton, N. C., on brief), for appellees.

Before RUSSELL, FIELD and WIDENER, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

The plaintiff appeals from a judgment of the District Court dismissing his action for affirmative injunctive relief reinstating him in his position as teacher and bandmaster in the defendant Edenton-Chowan School system, and for back pay, attorneys' fees and costs. We affirm.

The plaintiff is black. For eighteen years he had been employed as a teacher and band director in the defendant school system. For some years prior to 1970, he had been employed as a band director at a junior high school which had been integrated under court order in 1968. In the spring of 1970 a vacancy developed at the senior high school in the system. The plaintiff applied for transfer to that position. The District Court found, and the plaintiff does not contest, that the school authorities at the time expressed some doubt of the plaintiff's competency to assume the greater responsibility connected with the position at the senior high school. After indicating that if given the position he would have to improve, the school authorities made him co-director of the band at that school. The next year, the co-director

resigned on account of illness. The plaintiff, though he had been told by the school officials that his performance during the previous year at the senior high school had not been satisfactory, asked to be made the sole band director at the school. He excused his unsatisfactory performance the previous year on the ground that it arose out of the division of authority during the period of the co-directorship. The school authorities acceded to his request with some reluctance and made him the band director at the senior high school for the 1971–72 school year.

His services during the 1971–72 school year, the school officials testified and the District Court found, were again unsatisfactory. The then-school superintendent testified that at a conference with the plaintiff, prior to the end of that school year, he told the plaintiff that his performance as a teacher and band director had "gone backward" during that school year and that "he had not shown improvement in the areas that we had talked about in discipline and organization and purchase procedure." Despite this warning, the school officials testified and the District Court found that the problems connected with the plaintiff's performance continued and as a result nonrenewal of his contract for the subsequent 1972–73 school year was seriously canvassed by the Board. After some discussion the Board decided to give the plaintiff "another chance at giving a good performance in his position." The school superintendent, in a follow-up conference with the plaintiff, reviewed anew "the criticism that [he] had had about discipline, organization, the handling of the finances of the band." He emphasized to the plaintiff that he would be on probation for the next school year and warned him "that if he did not improve [he, the superintendent] felt sure that [he] would not be in a position to recommend him the next year."

The difficulties experienced by the school authorities with the plaintiff over the prior two or three years continued during the 1972–73 school year. They finally reached the point where the superintendent of the school system notified the plaintiff on March 14, 1973, that he intended to recommend the plaintiff's dismissal "on the grounds of incompetency of performance as a teacher and insubordination." He, however, advised the plaintiff at the same time that he had a right to request a review of such recommendation by a panel designated by the State Superintendent of Public Instruction. On April 19, 1973 the chairman of the School Board itself, however, wrote the plaintiff that, since it was only a few weeks before the school year would end, it would be a waste of time to proceed with the dismissal and the notice of recommendation for dismissal was accordingly revoked. At the same time, the chairman, acting for the Board, advised the plaintiff that his "contract * * * terminates at the end of the current school year and the contract will not be renewed." He added that if the plaintiff wished to have a statement of the reasons for the nonrenewal, he should communicate with the school superintendent who would provide the reasons. He and his attorney, at a conference with the superintendent, were given, at plaintiff's request, both orally and in writing, the reasons for the nonrenewal. He was, also, told that if he were "dissatisfied with the reasons given as to why [his] contract [was] not being renewed," he could request a hearing before the Board itself. Thereafter, on May 8, 1973, the plaintiff, through his counsel, requested a hearing before the Board "so that [I] may contest the reasons given to [me] for the proposed nonrenewal of [my] contract."

The requested hearing before the Board was set originally for May 18 but continued over until May 24 at the request of the plaintiff. When the hearing before the Board was held, the chief point of contention was the private character of the hearing. This is clear from the uncontradicted testimony at the trial in this case. The chairman of the Board testified without contradiction that plaintiff's counsel's "main complaint, as I remember it, [was] that [the hearing] was not public" and "therefore, * * * [he, as plaintiff's counsel was] not going

to make any effort to defend [his] client or offer any evidence in his behalf at the hearing because it wasn't open to the public." He stated this was so, "although he had many witnesses he could have brought." It was, also, testified—again without contradiction—that plaintiff's counsel said at the hearing "that a fair hearing could only be had if Mr. Satterfield's neighbors and friends could hear all of the evidence in the case."

Beyond protesting the absence of a public hearing, plaintiff and his counsel, though remaining throughout the hearing, took no active part in the hearing. Two witnesses were heard by the Board at the hearing. They were the superintendent and the principal of the school. In the hearing in this case, it was testified—again, without contradiction—that plaintiff was not denied during the Board hearing the right to cross-examine, through his counsel, the superintendent and principal, to testify himself, or to offer witnesses on his behalf. The choice not to offer any testimony or to cross-examine the superintendent and principal at the Board hearing was accordingly that of the plaintiff and his counsel. At the conclusion of the hearing, the Board filed a written finding that the plaintiff's "contract will terminate at the end of the current school year and will not be renewed." The plaintiff thereupon filed this suit.

■ It should be noted, preliminary to a consideration of the several contentions of the plaintiff on appeal, that he initially brought the action both as an individual action and as a class action, claiming that he was "dismissed" "pursu-

ant to defendants' longstanding practice of discriminating against black educators." So far as his individual action is concerned, he charged that "the defendants denied him the support previously afforded to the white band director, harrassed him with petty and unfounded charges and eventually dismissed him, using as a pretext insignificant and/or unfounded charges against him." After a trial, at which it was established that only one black educator, other than the plaintiff, had had his contract denied renewal by the Board in recent years, the District Court dismissed the class action aspect of the action. It, also, made an express finding that the nonrenewal of plaintiff's contract "was not racially motivated but was based solely on the plaintiff's performance as a teacher." The plaintiff does not contest either the dismissal of the class action or the want of racial motivation in the nonrenewal of his contract. His sole contention on appeal is that he was entitled to a due process hearing on the nonrenewal of his contract before the Board and that he was denied that right.[1] Whether he was so entitled and, if so, whether such a hearing was accorded him are the only issues on appeal.

■ Relying on *Williams v. Hyde County Board of Education* (4th Cir. 1974) 490 F.2d 1231, the District Court held that the plaintiff as a probationary teacher under North Carolina law was not entitled to an "adversary hearing" before the Board under *Roth*[2] and *Sindermann*[3] because he "did not have tenure," nor "the equivalent of tenure."[4] The plaintiff counters, however, with the

---

1. He does not claim that the nonrenewal was "arbitrary or capricious," as did the plaintiff in his second cause of action in *Taylor v. Crisp* (1975) 286 N.C. 488, 212 S.E.2d 381. Such a claim would not, however, give him a right to a hearing but would be the basis for a judicial trial.

2. *Board of Regents v. Roth* (1972) 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548.

3. *Perry v. Sindermann* (1972) 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570. For a statement of the circumstances under which *Sindermann* is applicable, *see Russell v. Hodges* (2d Cir. 1972) 470 F.2d 212, 216.

4. The plaintiff does suggest, though he does not forcefully press it, that under the 1973 Amendments to the North Carolina school law, he, even as a probationary teacher, could not be denied a renewal of his contract without a hearing. For such point he relies on § 115–142(m)(2), N.C.G.S. of these Amendments, a section that deals with the rights of a *probationary teacher*. We do not read that section as granting him, a probationary teacher under applicable North Carolina law, a right to a hearing. The section expressly empowers the Board to refuse renewal of the contract to a probationary teacher for "any cause it deemed sufficient; provided, however, that the

argument that, whether entitled to the right of such a hearing or not, the Board granted a hearing and, in granting a hearing, it assumed an obligation to give plaintiff a hearing affording him procedural due process. For this contention he relies on *Horton v. Orange County Board of Education* (4th Cir. 1972) 464 F.2d 536, and *United States v. Heffner* (4th Cir. 1969) 420 F.2d 809. Whether the simple grant of the courtesy of a hearing under the circumstances of this case creates a right to a due process hearing may be open to serious doubt. *Cf., Kota v. Little* (4th Cir. 1973) 473 F.2d 1, 3. We find it unnecessary, however, to resolve the issue of the right of the plaintiff to a due process hearing before the Board, either under *Sindermann* or because of the voluntary grant of a hearing by the Board itself, since the hearing granted the plaintiff by the Board, in our opinion, satisfied the minimum due process standards to which the plaintiff would have been entitled had he had a valid claim to a hearing.[5]

The plaintiff would find some initial predicate for his claim of denial of procedural due process in an ambiguous exchange of correspondence between his counsel and counsel for the Board prior to the commencement of the Board hearing. Plaintiff's counsel wrote the Board's counsel, stating what he conceived to be the rights of the plaintiff at the hearing granted and requesting an expression of agreement or disagreement thereto by Board's counsel. Board's counsel did not reply directly but stated that the "form and procedure to be followed" at the hearing would be as previously set forth in a letter of the school superintendent. This letter of the superintendent said the hearing would be "private," the plaintiff might be represented by counsel, the witnesses heard could be questioned by him, and he could offer testimony on his own behalf. The plaintiff was, also, given in another letter the names of the witnesses who would be heard in justification of the nonrenewal. This letter of counsel, fairly construed, cannot be regarded as stating conditions abridging any constitutional rights the plaintiff may have had to a due process hearing. And this conclusion is reinforced by the manner in which the hearing itself was conducted. At the hearing, the plaintiff was not denied the right either to testify himself or to call witnesses in his behalf. He was offered the opportunity to question the witnesses heard by the Board. He had a full opportunity to assail the charges against him, either by cross-examination of the witnesses heard by the Board or by his own testimony or that of others. Through his counsel, he asserted he had witnesses available but, as we have already stated, declared he did not intend to call them for no other reason than that the hearing was not open to the general public. His counsel knew he could cross-examine the witnesses for

---

cause may not be arbitrary, capricious, discriminatory or for personal or political reasons." It makes no provision whatsoever for any hearing when renewal is denied a probationary teacher. If there is a claim of "arbitrary or capricious" nonrenewal, it is an independent right of action, triable, not by the school Board but by the Court. That this omission of a right to a hearing in the case of a probationary teacher was not inadvertent but purposeful appears plain from the other provisions in the Amendments which specifically require hearings on the nonrenewal of the contract of a "career teacher" (*i. e.*, one with tenure). The absence of any similar provision for probationary teachers in the Amendments compels, it seems to us, the conclusion that no such right to a hearing was intended or contemplated for the probationary teacher denied renewal. And this appears to be the construction placed on the statute by the North Carolina courts. *Taylor v. Crisp, supra.* It follows that any right of the plaintiff to a hearing must rest on his claim of "de facto tenure." And this is apparently the view of the plaintiff for it is not to the North Carolina law but to *Roth* and *Sindermann* that he basically looks for support of his claim of right to a due process hearing.

5. Due process is not a "rigid formula or simple rule of thumb," *Hagopian v. Knowlton* (2d Cir. 1972) 470 F.2d 201, 207, and, "[t]he Fifth Amendment does not require a trial-type hearing in every conceivable case of government impairment of private interest. * * * The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria Workers v. McElroy* (1961) 367 U.S. 886, 894–5, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230.

the Board but, again, he chose to forbear for the same reason that prompted him not to call witnesses. As has been often said, "[t]he fundamental requirement of due process 'is the opportunity to be heard, "at a meaningful time and in a meaningful manner," ' " [6] and, when this opportunity is granted a complainant, who chooses not to exercise it, that complainant cannot later plead a denial of procedural due process.[7] Whether the hearing met the due process criteria must be determined, not by the prior exchange of correspondence between counsel but by what rights were accorded the plaintiff at the hearing and what objections, if any, were made at that hearing by the plaintiff or his counsel.

■■ The first alleged defect in the Board's proceeding, as specified by the plaintiff, was the denial of what he asserted was his "right to a pretermination hearing." As an aside, it might be observed that, in a strict sense, the Board did not "*terminate*" the plaintiff's employment. To paraphrase slightly the language of this Court in *Kota v. Little, supra,*[8] "[i]n fact, the Board did not terminate [Satterfield's] employment but rather declined to renew his employment contract beyond the [1972–73] academic year." We need not quibble over this point, whatever its merit, though, for the law is clear that a person such as the plaintiff has no absolute right to a pretermination hearing, even under *Roth* and *Sindermann*. This was specifically decided in *Arnett v. Kennedy* (1974) 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15, as that case has uniformly been construed. *See Vance v. Chester County Board of School Trustees* (4th Cir. 1974) 504 F.2d 820; *Brubaker v. Board of Ed. School Dist. 149, Cook Cty., Ill.* (7th Cir. 1974) 502 F.2d 973, *cert. denied* 421 U.S. 960, 95 S.Ct. 1953, 44 L.Ed.2d 451; *Davis v. Vandiver* (5th Cir. 1974) 494 F.2d 830;

*Eley v. Morris* (3-judge ct. Ga.1975) 390 F.Supp. 913; *Mondell v. Mayor and City Council of Baltimore* (D.Md.1974) 378 F.Supp. 219. Thus, in *Davis*, the Court speaking to *Arnett*, said that "our hand is clearly guided by that case, inasmuch as six Justices expressly concurred in the proposition that a post-termination hearing was sufficient to protect those interests meriting due process protection, whether those interests were in the nature of 'property' or 'liberty.' " [9] And, in a thoughtful opinion in *Mondell*, Judge Kaufman reached the same conclusion, stating:

> "Notwithstanding the divergent views of the members of the Supreme Court in *Arnett*, what emerges clearly is that in that case the majority of the Court rejected the position of Justices Brennan, Douglas and Marshall that a hearing must be held before discharge, and also rejected Mr. Justice White's position that an employee is entitled to suspension with pay until a hearing is held."

We have no difficulty, therefore, in concluding on the authority of *Arnett* that the plaintiff suffered no loss of a constitutional right as a result of the Board's action in approving, subject to a right of a hearing, the superintendent's recommendation that plaintiff's contract not be renewed.

■ On this appeal, as well as at the hearing before the Board and in the District Court, the plaintiff centers his primary attack on the denial of a "public" hearing. It is not unusual that such hearings as that involved here are held in private.[10] In fact, the procedure followed here is the normal pattern in non-renewal cases. The North Carolina Amendments of 1973, to which the plaintiff often alluded in his argument, but which neither party apparently considered as relevant to this controversy,

6. *Birdwell v. Hazelwood School District* (8th Cir. 1974) 491 F.2d 490, 495; *see, also, Grimes v. Nottoway County School Board* (4th Cir. 1972) 462 F.2d 650, 653, *cert. denied* 409 U.S. 1008, 93 S.Ct. 439, 34 L.Ed.2d 318 (1972).

7. *Birdwell v. Hazelwood School District, supra*, 491 F.2d at 495.

8. 473 F.2d 2, n. 1.

9. 494 F.2d at 832.

10. *See Beattie v. Roberts* (1st Cir. 1971) 436 F.2d 747 at 748, overruled on another point, *Raper v. Lucey* (1 Cir.) 488 F.2d 748, 751, where plaintiff's counsel "protested because the hearing was not public * * *."

specifically provide that hearing on the termination of employment of even career teachers "shall be private." [11] The purpose of the provision is as much for the protection of the teacher involved as for the school officials. It is a provision that finds a counterpart in other types of proceedings, for the public hearing or trial concept, while embedded in the Sixth Amendment as a requirement of criminal trials, is not inflexibly applied in all civil proceedings. Thus in juvenile proceedings, which are treated as civil rather than criminal proceedings even though the result may be institutional commitment for the juvenile, the procedure generally does not contemplate or authorize public hearings. [12] And "[T]he power of the legislature to authorize the hearing of divorce cases in camera has been expressly upheld." [13] Equally relevant considerations warrant confidentiality of personnel records and proceedings. [14] We would be inclined, had the issue been raised and the statute been relevant, to find constitutional the North Carolina statute, which directs that any proceedings involving the termination of a career teacher's employment be "private." It is not necessary, however, to rest our conclusion on the analogy of the present North Carolina statute as it relates even to a career teacher (*i. e.*, one with tenure) as distinguished from a probationary teacher, which was plaintiff's status. The record provides a perfectly well settled basis for a denial of a public hearing in this proceeding.

The Board based its refusal to accord the plaintiff a public hearing on the threat which such a hearing would present to an orderly hearing and disposition of plaintiff's case. And the record justified such fear, as the District Court stated in its Findings of Fact. There had been, prior to the hearing, considerable effort to arouse racial controversy over the plaintiff's nonrenewal. [15] Plaintiff claims he was not responsible for these efforts. He was, however, aware of the efforts and made no effort to discourage them. The results of these efforts, as they affected the opportunity for an orderly hearing before the Board, were forcefully demonstrated at the first scheduled hearing, postponed at the request of plaintiff's counsel. A group, unaware the hearing had been postponed, arrived at the school's administration offices where the hearing was to be held, took over the superintendent's office, declaring they would not leave or permit business to proceed until plaintiff's contract was renewed. They remained in the school until that night despite the efforts of the school authorities to induce them to leave. It finally became necessary to call the police authorities to eject them. [16] It is thus obvious

---

11. In *Fitzgerald v. Hampton* (1972) 152 U.S. App.D.C. 1, 467 F.2d 755, relied on by the plaintiff as sustaining his rights to a public trial, the Court said at 764: " * * * And in administrative hearings, the rule of the 'open' forum is prevailing—if not by statutory mandate, then by regulation or practice." In the type of proceeding involved here, the "statutory mandate" is against "public" hearings. Whether the Court in *Fitzgerald* would have found want of due process in failure to accord a public hearing where there is such a "statutory mandate" may be open to doubt.

12. *In re Gault* (1967) 387 U.S. 1, 4, 87 S.Ct. 1428, 18 L.Ed.2d 527; *Kent v. United States* (1966) 383 U.S. 541, 555, 86 S.Ct. 1045, 16 L.Ed.2d 84.

13. 24 Am.Jur.2d at p. 474.

14. In *Birdwell, supra,* the plaintiff-teacher, also, complained that hearing was "behind closed doors." 491 F.2d at 494.

15. The Finding of the District Court on this point—a finding not challenged on this appeal—is as follows:

" * * * Since the news of the non-renewal of plaintiff's contract had given rise to considerable racial unrest and controversy in the Edenton community, the defendants on advice of their counsel and fearing an outbreak of racial violence in the community, declined to allow the hearing to be held in public."

16. The District Court found that on this occasion

"a group of about forty black persons led by one Dupree Clark, described as a 'Tuscarora Indian' entered the administrative offices of the Edenton-Chowan School System and announced that they were going to remain until the plaintiff's contract was renewed. The defendant Superintendent of Schools, Edwin L. West, Jr., was held a virtual prisoner in

that there was a concerted movement to overawe the Board in its deliberations and to coerce it into rescinding the non-renewal of plaintiff's contract. Under those circumstances, the Board was fully justified in conducting its hearing in private. Indeed, had the proceedings been a criminal trial and despite the constitutional command of the Sixth Amendment, the Board may well have been warranted in taking the action it did. In criminal proceedings, "[t]he constitutional right to a public trial is not a limitless imperative." [17] A court has inherent power to assure order and decorum and to prevent a criminal defendant's sympathizers in the courtroom from interfering with an orderly disposition of the prosecution.[18] Certainly in a proceeding such as this, which was not a criminal prosecution and to which the Sixth Amendment did not specifically relate, the Board has a similar right to proceed in private and we find no error in the finding and conclusion of the District Court that there was no violation of due process rights in conducting the hearing in private.

▪ Another claim of the plaintiff is that the Board was disqualified because of their prior action in approving, subject to a right to a hearing, the recommendation of the school superintendent, and because of the personal observance of one of the incidents referred to by the superintendent in his presentation by one member of the Board.[19] These possible grounds of disqualification were known to the plaintiff and his counsel before they requested a hearing, and at least before the hearing itself by the

Board. If plaintiff or his counsel had considered the Board or any member of it disqualified, they had an obligation to raise the point. They could not demand a hearing before a Board which they were later to claim, on facts available to them when they made the demand, was disqualified to have the hearing. By requesting a hearing by the Board, they recognized the competency and qualification of the Board and its members to conduct such hearing. In his later letter to the Board in advance of the hearing wherein he stated the rights claimed by the plaintiff in connection with the hearing, the counsel nowhere raised the disqualification of the Board as a whole or of any member of it. At the hearing itself such counsel again failed to make any claim of the Board's disqualification. In fact, he refused to participate *only* because the hearing was not public.[20] Plaintiff's counsel is able and experienced, particularly in school matters. When plaintiff and his counsel, with knowledge of the very grounds they now urge as a basis for disqualification, failed to raise that claim of disqualification until after the Board, at their request, had granted plaintiff a hearing, and had decided against the plaintiff, the plaintiff lost any right to press that point later. One must raise the disqualification of the trier, whether he be a judge, an administrator, or an arbitrator, at the earliest moment after knowledge of the facts.[21] In *Duffield*, it was stated:

> " * * * A claim of disqualifying bias or partiality on the part of a member of the judiciary or an administrative agency must be asserted

his office all day and until the early evening hours when these persons were finally removed from the building by law enforcement officers."

17. *Lacaze v. United State* (5th Cir. 1968) 391 F.2d 516, 521; *United States v. Herold* (2d Cir. 1966) 368 F.2d 187, 188 and 408 F.2d 125, 127–8; *United States v. Fay* (2d Cir. 1965) 350 F.2d 967, 971, *cert. denied* 384 U.S. 1008, 86 S.Ct. 1961, 16 L.Ed.2d 1021 (1966).

18. *United States v. Fay, supra,* 350 F.2d at 970.

19. *See Simard v. Board of Education of Town of Groton* (2d Cir. 1973) 473 F.2d 988, 993, n. 8.

20. *Beattie v. Roberts, supra,* 436 F.2d at 750.

21. *Duffield v. Charleston Area Medical Center, Inc.* (4th Cir. 1974) 503 F.2d 512, 515–6; *Firemen's Fund Ins. Co. v. Flint Hosiery Mills* (4th Cir. 1935) 74 F.2d 533, 535, *cert. denied* 295 U.S. 748, 55 S.Ct. 826, 79 L.Ed. 1692 (1934); *Cook Industries, Inc. v. C. Itoh & Co. (America) Inc.* (2d Cir. 1971) 449 F.2d 106, 108, *cert. denied* 405 U.S. 921, 92 S.Ct. 957, 30 L.Ed.2d 792 (1972).

promptly after knowledge of the alleged disqualification." [22]

In disposing of the issue as waived, we would not be understood as holding that the Board was disqualified by its prior *ex parte* action in hearing plaintiff's claim for a renewal of his contract.[23]

Finally, the plaintiff makes a point that some of the testimony given by the two school officials related to complaints received by them. This testimony, the plaintiff asserts, was impermissible hearsay. These complaints were, the record shows, called to the plaintiff's attention during conferences of the plaintiff with his principal and the superintendent of the schools. By way of answer to the complaints, the District Court found that "Mr. Satterfield would only state that he was unaware of the students' actions" which had prompted the complaints. It is by no means clear that testimony detailing complaints received by the school officials, and in turn submitted to the plaintiff with request for an explanation, coupled with his explanations, would constitute impermissible hearsay.[24] But if such testimony did, it is not sufficient to generate a federal claim in the context of a school Board hearing. Such testimony, even if hearsay, at an informal hearing such as that conducted by the Board, does not violate due process. As the Court said in *Ford v. Jones* (D.C.Ky.1974) 372 F.Supp. 1187, 1189:

> "'Although hearsay reports . . are inadmissable in a court of law, I certainly do not hold that they are inadmissable in administrative hearings . . ., for such hearings need not conform to the standards of judicial or quasi-judicial trials, and flexibility and informality should often characterize

them. Moreover it is possible that even reports of unnamed observers may by referring to a specific occasion allow the teacher an adequate opportunity to explain her conduct on that occasion.' *Carpenter v. City of Greenfield School District No. 6*, supra [D.C. Wis.] 358 F.Supp. [220] at 226–227."

The real evidence of incompetency and insubordination, as presented by the superintendent and principal, though, was based, not on hearsay or complaints made by others, but on the actual observation and the personal knowledge of the witnesses. The absence of any discipline in plaintiff's classroom during class—some knitting, others sleeping, others with hats on their head, still others working on homework—was observed personally by the principal. The fact that the plaintiff gave grades—and good grades at that—to students who had withdrawn from school and had not even been present was a matter clearly evident to the witnesses by the school's records. The obdurate refusal by the plaintiff to develop as a part of his program a school chorus, even though this was his obligation as stated to him when employed according to the witnesses, was likewise within the knowledge of the school officials who testified. The plaintiff showed further contumacy in disregarding other rules of the school both in observing the administrative procedures of the school and in his conduct toward pupils. Thus the school principal excused a student for sickness; the plaintiff refused to consider such excuse, although it was school policy to do so, because the student had not secured permission from the plaintiff to be absent. He, also, continuously "violate[d] the purchasing procedures" of the school,

---

**22.** *See also*, Griffis and Wilson, *Constitutional Rights and Remedies in the Non-Renewal of a Public School Teacher's Employment Contract*, 25 *Baylor L.Rev.* 550 at 573, where the authors say:

" * * * In summation, a teacher must assert his procedural safeguards at the time he is entitled to them or be faced with a waiver of those rights. The denial of Due Process must be overt on the part of the defendant, and a teacher may not sit idly by and tacitly

consent to an improper hearing in order to assert a cause of action at a later time."

**23.** *See Withrow v. Larkin* (1975) 421 U.S. 35, 47–50, 95 S.Ct. 1456, 43 L.Ed.2d 712; *Duffield v. Charleston Area Medical Center, Inc., supra.*

**24.** The fact that there were complaints, earlier called to the plaintiff's attention, would be evidence of dissatisfaction with his work as a teacher. *See* Frankt, *Non-Tenure Teachers and the Constitution*, 18 *Kansas L.Rev.* 27, 50–3, (1969).

even though this violation had been discussed with him "on six or more occasions," as the District Court states in its Findings of Fact. It is obvious from this brief review of the evidence why the plaintiff bases his appeal on claims of denial of due process and not on merits of his nonrenewal.

 So far as the contention that the Board failed to give plaintiff a statement of the grounds for its nonrenewal, it is sufficient that these had been given to the plaintiff and his counsel by the school superintendent prior even to the request for a hearing. The Board in its decision sustained those grounds as so given the plaintiff. While it no doubt would have been preferable that the Board should have restated the grounds in its final decision, we do not think that under the circumstances, any violation of constitutional rights resulted from the procedure followed by the Board.

We held in *Grimes v. Nottoway County School Board, supra*,[25] and repeated in *Vance v. Chester County Board of Trustees, supra*,[26] that the minimal due process to which a teacher whose contract has been denied renewal or has been terminated, is "adequate notice, a specification of the charges against her, an opportunity to confront the witnesses against her and an opportunity to be heard in her own defense." All this the plaintiff was given in the proceedings before the Board. He has, also, had his day in court as well. He has twice confronted the witnesses against him and has been given the right to cross-examine them. He has been given the right twice to present his side of the story. Both the Board and particularly the Court which heard fully all the evidence both in favor and against the plaintiff, have found that the plaintiff was properly denied renewal of his contract because of his incompetency as a teacher and his insubordination. Had there been any defect in the proceedings before the Board, the decision of the District Court would make any remand of this case un-

necessary.[27] For the reasons stated, however, we conclude the Board gave the plaintiff a "meaningful hearing," which is all he was entitled to under due process.

The judgment of the District Court is affirmed.

*Affirmed.*

---

**25.** 462 F.2d at 653.

**26.** 504 F.2d at 824.

**27.** *Horton v. Orange County Board of Education, supra*, 464 F.2d at 538.